J-A15039-17
J-A15040-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

HARRY J. LAFFERTY, MICHAEL D. KIRN, :    IN THE SUPERIOR COURT OF
ROBERT T. KIRN, JOHN J. ROEDELL, :        PENNSYLVANIA
JOHN M. FERRIS, AND ROBERT F. :
FERRIS :
  :
          v. :
  :
THOMAS D. FERRIS, :
  :
         Appellant :      No. 1131 MDA 2016

Appeal from the Order entered June 27, 2016
in the Court of Common Pleas of Susquehanna County,
Civil Division, No(s): 2008-01941

HARRY J. LAFFERTY, MICHAEL D. KIRN, :    IN THE SUPERIOR COURT OF
ROBERT T. KIRN, JOHN J. ROEDELL, :        PENNSYLVANIA
JOHN M. FERRIS, AND ROBERT F. :
FERRIS :
  :
          v. :
  :
THOMAS D. FERRIS, :
  :
         Appellant :      No. 1619 MDA 2016

Appeal from the Order entered September 16, 2016
in the Court of Common Pleas of Susquehanna County,
Civil Division, No(s): 2008-01941

BEFORE: MOULTON, SOLANO and MUSMANNO, JJ.

MEMORANDUM BY MUSMANNO, J.:        **FILED SEPTEMBER 21, 2017**

Thomas D. Ferris ("Ferris") appeals from the Orders denying his Post-

Trial Motion, and granting the Motion to Enforce filed by Harry J. Lafferty

("Lafferty"), Michael D. Kirn, Robert T. Kirn, John J. Roedell, John M. Ferris,

and Robert F. Ferris ("R. Ferris") (collectively, "Plaintiffs"). We affirm the

trial court's June 27, 2016 Order, and vacate the trial court's subsequent Orders of August 23, 2016 and September 16, 2016.[1]

Briefly, in August 1998, Ferris and Plaintiffs created a limited liability company known as Facowee Acres, LLC ("Facowee Acres").[2] In October 1998, Ferris and his brother, R. Ferris, purchased a 100-acre parcel in Susquehanna County, Pennsylvania ("the Property"), to be used as a hunting lodge for members of Facowee Acres (the Plaintiffs and Ferris, hereinafter collectively referred to as "the members"). Ferris and his brother, R. Ferris, executed a mortgage on the Property. Each of the members of Facowee Acres orally agreed to pay, over time, the mortgage and other related costs for the Property. Upon payment in full by the members, R. Ferris and Ferris would transfer the Property to the members, who then would transfer the Property to Facowee Acres.

---

[1] Ferris appeals from the June 27, 2016 Order of the trial court, which denied his Post-Trial Motion (docketed at No. 1131 MDA 2016), and the trial court's August 23, 2016 and September 16, 2016 Orders (docketed at 1619 MDA 2016), which modified the trial court's January 11, 2016 verdict/Order, and granted Plaintiffs' Motion to Enforce. We have combined the appeals for ease of disposition. As we will discuss *infra*, although no judgment has been entered, we consider this an appeal of the trial court's June 27, 2016 Order, and the matter properly before us for disposition.

[2] Facowee Acres was named as a plaintiff in the Second Amended Complaint, but no attorney entered an appearance on its behalf. In their Response to Ferris's February 16, 2010 Rule to Show Cause, Plaintiffs denied that Facowee Acres is a plaintiff in these proceedings. Facowee Acres is not identified as a plaintiff in subsequent filings.

In addition, in 1999, Ferris purchased, in his name, a 4.4-acre parcel adjacent to the Property ("the Adjacent Property"). The members agreed that the Adjacent Property would be added to the Property, and that the members would pay for the Adjacent Property in the same manner in which they were paying for the Property. Ferris subsequently transferred title to the Adjacent Property to himself and R. Ferris.

Over time, payments made by members were deposited into a bank account owned by R. Ferris. Expenses for the Property and the Adjacent Property, including real estate taxes and maintenance expenses, were paid from that bank account. All of the members, except Ferris, paid their respective shares of the mortgage and related expenses for the Property and the Adjacent Property. Throughout this time period, the members used the Property and the Adjacent Property for hunting. Improvements also were made to the Property.

In 2007, Ferris told the members that he wished to sell back his interest in Facowee Acres. However, when members asked Ferris to convey the Property and the Adjacent Property in accordance with their oral agreement, he refused.

Subsequently, without the knowledge of the other members, Ferris and R. Ferris used the Property and the Adjacent Property as collateral for a $125,000 equity line of credit, used solely for their own benefit. In August 2008, R. Ferris and Ferris executed a natural gas lease with Chesapeake

Appalachia, LLC ("Chesapeake") for the Property and Adjacent Property, for an up-front payment of $28,500.[3]

In December 2008, Plaintiffs filed the instant equity action against Ferris. Ferris filed a counterclaim, seeking partition of the Property and Adjacent Property. On January 11, 2016, following a non-jury trial, the trial court entered an Opinion and Order determining that an enforceable agreement existed between Ferris and the Plaintiffs. In accordance with this oral agreement, the trial court ordered Ferris and R. Ferris to execute a special warranty deed conveying title to the Property and the Adjacent Property to Plaintiffs and Ferris, in their respective proportionate shares. The trial court further dismissed Ferris's counter-claim.[4]

Ferris filed a Post-Trial Motion for a new trial on January 26, 2016. On May 31, 2016, Plaintiffs filed a Praecipe to enter judgment. However, no judgment was entered. On June 6, 2016, Ferris filed a Praecipe/Application to amend the trial court's Order to include determination of finality. On June 24, 2016, Ferris filed a Notice of Appeal of the trial court's May 31, 2016 "order," although no such order was entered. This Court docketed the

---

[3] The trial court directed that Ferris and R. Ferris deposit the Chesapeake funds with the court.

[4] We also adopt, as though fully restated herein, the trial court's comprehensive summary of the factual and procedural history underlying the instant appeal. **See** Trial Court Opinion, 1/11/16, at 2-27.

appeal at No. 1026 MDA 2016. By an Order entered on August 17, 2016, this Court quashed the appeal.[5]

On June 27, 2016, the trial court entered an Order denying Ferris's post-trial Motions. On July 13, 2016, Ferris filed a Notice of Appeal of the June 27, 2016 Order, which this Court docketed at No. 1131 MDA 2016. On August 17, 2016, this Court entered an Order directing the trial court to enter judgment within 10 days. No judgment appears on the docket.

On August 18, 2016, while Ferris's appeal at No. 1131 MDA 2016 was pending, Plaintiffs filed a Motion to Enforce the trial court's January 11, 2016 Order. On August 23, 2016, the trial court entered an Order both granting Plaintiff's Motion to Enforce, and issuing a Rule to Show Cause why Plaintiffs' Motion should not be granted. The trial court subsequently entertained oral argument on Plaintiffs' Motion to Enforce. On September 16, 2016, the trial court again entered an Order granting Plaintiffs' Motion to Enforce. The trial court's Order also modified its January 7, 2016 verdict and Order to allow for an alternative remedy *i.e.*, the execution of a general warranty deed transferring title of the Property and Adjacent Property to Facowee Acres. Ferris filed a second Notice of Appeal challenging the trial court's September 16, 2016 Order. That appeal is docketed at No. 1619 MDA 2016.

In his appeals, Ferris presents the following claims for our review:[6]

---

[5] This Court stated that Ferris could "raise any and all properly preserved issues that he intended to raise at No. 1026 MDA 2016" in his subsequent

- 5 -

1.  Whether failure to include numerous indispensable parties in the action involving the adjudication of the non-parties' real estate and royalty rights renders the trial court's Order null and void such that there was a denial of due process of law[?]

2.  Does estoppel by [d]eed, equitable estoppel and the statute of frauds bar a cause of action for reformation of deed based on an alleged oral agreement regarding the transfer of interests in land when a recorded deed, mortgages, timber and gas contracts all consistently affirm title to the record owners, who own it with joint right of survivorship[?]

3.  Whether the [t]rial [c]ourt erred as a matter of law and committed a gross abuse of discretion when it—without lawful authority or jurisdiction to do so—first considered an untimely Motion for Reconsideration filed by [Plaintiffs] and then substantively modified/amended, by an undated Order of Court entered on August 23, 2016[,] and an Order dated September 16, 2016, its earlier, final Order … filed on January 11, 2016?

4. Under Pennsylvania Law, can a judge sitting in an equal common pleas court violate a litigant's due process rights and violate the coordinate jurisdiction doctrine, and [the] law of the case doctrine, by preventing and restricting the entire presentation of the case [for Ferris's counterclaim,] when it only allowed 1 hour for [Ferris's] entire case[,] but allowed 8 days for [Plaintiffs' case?]

5.  Whether the [t]rial [c]ourt erred when it refused to allow more than 1 hour of testimony and barred impeachment statements made in a deposition[?]

Brief of Appellant (No. 1131 MDA 2016) at 7-9; Appellant's Brief (No. 1619 MDA 2016) at 4-5.

_____

appeal, filed at No. 1131 MDA 2016.

[6] We have combined for disposition Ferris's issues set forth at No. 1131 MDA 2016 (appeal from the trial court's June 27, 2016 Order denying Ferris's Post-Trial Motion) and No. 1619 MDA 2016 (appeal from the August 23, 2016 and September 16, 2016 Orders granting Plaintiffs' Motion to Enforce).

- 6 -

"The scope of review of a final [order] in equity is limited and will not be disturbed unless it is unsupported by the evidence or demonstrably capricious." **Sack v. Feinman**, 413 A.2d 1059, 1066 (Pa. 1980); **accord Nicholson v. Johnston**, 855 A.2d 97, 100 (Pa. Super. 2004).

> Our standard of review following a non-jury trial is as follows:
>
> Upon appeal of a non-jury trial verdict, we consider the evidence in a light most favorable to the verdict winner and will reverse the trial court only if its findings of fact lack the support of competent evidence or its findings are premised on an error of law.
>
> When this Court reviews the findings of the trial judge, the evidence is viewed in the light most favorable to the victorious party below and all evidence and proper inferences favorable to that party must be taken as true and all unfavorable inferences rejected. The court's findings are especially binding on appeal, where they are based upon the credibility of the witnesses, unless it appears that the court abused its discretion or that the court's findings lack evidentiary support or that the court capriciously disbelieved the evidence.

**Nicholas v. Hofmann**, 158 A.3d 675, 688 (Pa. Super. 2017) (citation and quoted citation omitted). "The trial court's conclusions of law on appeal originating from a non-jury trial are not binding on an appellate court because it is the appellate court's duty to determine if the trial court correctly applied the law to the facts of the case." **Richards v. Ameriprise Fin., Inc.**, 152 A.3d 1027, 1034 (Pa. Super. 2016) (brackets and citation omitted). Where the issue concerns a question of law, our scope of review is plenary. **Id.**

In his first issue, Ferris argues that the trial court's Orders must be vacated based upon Plaintiffs' failure to join an indispensable party. Brief of Appellant (No. 1131 MDA 2016) at 20. Specifically, Ferris claims that Plaintiffs did not name Facowee Acres as a party, "despite the fact that all property under dispute is[,] as alleged by Plaintiffs[,] owned by [] Facowee Acres[.]" *Id.* Ferris contends that, according to the testimony of R. Ferris, "there was an agreement that the real properties that are the subject of this lawsuit should have been conveyed to Facowee Acres, not the purported members of [Facowee Acres]." *Id.* at 22. According to Ferris, failure to join Facowee Acres as an indispensable party goes to the jurisdiction of the trial court, and an order rendered in the absence of an indispensable party is null and void. *Id.* at 22, 23. Ferris asserts that the trial court's finding, which determined the ownership interests of Plaintiffs, affected the rights of Facowee Acres. *Id.* at 24. In addition, Ferris contends that the trial court's alternative conveyance of property to Facowee Acres affected the rights of Facowee Acres. *Id.* at 24-25. Ferris argues that Facowee Acres's interest is integral to the case, and that each of the Plaintiffs has an interest different than that of Facowee Acres. *Id.* at 25-26. Therefore, Ferris asserts, the trial court's Orders determining the parties' interests should be vacated for lack of jurisdiction. *Id.* at 26.

We have explained that

[a] party is indispensable when his or her rights are so connected with the claims of the litigants that no decree can be made without impairing those rights. If no redress is sought against a party, and its rights would not be prejudiced by any decision in the case, it is not indispensable with respect to the litigation. We have consistently held that a trial court must weigh the following considerations in determining if a party is indispensable to a particular litigation.

> 1. Do absent parties have a right or an interest related to the claim?
>
> 2. If so, what is the nature of that right or interest?
>
> 3. Is that right or interest essential to the merits of the issue?
>
> 4. Can justice be afforded without violating the due process rights of absent parties?

In determining whether a party is indispensable, the basic inquiry remains whether justice can be done in the absence of a third party.

*Orman v. Mortg. I.T.,* 118 A.3d 403, 406-07 (Pa. Super. 2015) (citation omitted). If no redress is sought against a party, then its rights would not be prejudiced and accordingly, it is not essential. *Grimme Combustion, Inc. v. Mergentime Corp.*, 595 A.2d 77, 81 (Pa. Super. 1991).

Here, the trial court determined that

Plaintiffs have proven a valid oral agreement entered into by all Plaintiffs and [] Ferris, for the purchase and conveyance of the subject collective 104.4 acres [the Property and the Adjacent Property]. They have further proven that … Ferris[] has violated the agreement by not conveying the subject real property to the [] Plaintiffs in their respective shares. Lastly, there is no adequate remedy at law as to his nonperformance relating to the non-conveyance of the 104.4 acres.

Trial Court Opinion, 1/11/16, at 28. As found by the trial court, the oral agreement required Ferris and R. Ferris "to have the real property deeded to [Plaintiffs] upon their payment toward the purchase price." *Id.* The trial court's findings are supported in the record, and its legal conclusions are sound. *See, e.g.*, N.T., 8/29/12, at 67 (wherein R. Ferris confirmed his deposition testimony that "the agreement was[,] when everybody was paid in full[,] the [members'] names would be transferred to the deed."); 70 (wherein R. Ferris testified that he and Ferris signed the deed, "with the agreement that their [the members'] names would go on [the deed] later.").

Thus, as determined by the trial court, Facowee Acres was not an indispensable party. Any interest by Facowee Acres would arise only *after* the deed is transferred into the names of the members. Further, there is no redress sought from Facowee Acres. *See Grimme Combustion, Inc.*, 595 A.2d at 81. On this basis, we discern no error by the trial court in rejecting Ferris's claim that Plaintiffs had failed to join an indispensable third party.

In his second issue, Ferris argues that the trial court had no justification for ordering that the members directly be deeded shares of the properties. Brief of Appellant (No. 1131 MDA 2016) at 30. Ferris contends that the trial court considered the contract to be an installment contract. *Id.* Ferris argues that the trial court may not reform the agreement, and then interpret it as reformed. *Id.* According to Ferris, a court in equity lacks jurisdiction over this matter. *Id.*

Ferris further contends that the award of shares of each property to Plaintiffs is barred by the doctrine of equitable estoppel and estoppel by deed. *Id.* at 31. Ferris contends that he was induced into believing that he owned the properties with R. Ferris. *Id.*

In its Opinion, the trial court addressed these claims and concluded that they lack merit. *See* Trial Court Opinion, 1/11/16, at 27-28. The trial court's findings are supported in the record, and its legal conclusions are sound. We therefore affirm on the basis of the trial court's Opinion with regard to these issues, *see id.*, with the following addendum.

The trial court found that the members had orally agreed to contribute to the purchase price of the Property, the Adjacent Property, and their related costs over time. *Id.* at 5. In addition, the trial court found that "the correspondence of January 15, 2007[,] from [] Ferris stated, 'I have my $50,000.00 ready for the past two years to pay off the loan **and then get everyone's name on the property deed.**'" *Id.* at 15; *see also id.* at 18 (setting forth Lafferty's understanding that R. Ferris was to purchase additional shares of the properties from other members, and John M. Ferris's understanding that, "since the members were paid in full, their collective names would go on the deed for the subject 104 acres **and then be conveyed to Facowee Acres.**" (emphasis added)). The trial court's findings are supported in the record. *See* N.T., 4/30/12, at 270 (wherein R. Ferris testified that, at the time of closing on the Property, Ferris had not

paid his share of the purchase price), 271 (wherein R. Ferris testified that although Ferris had paid for the Adjacent Property in full, "that deed was transferred into the [Property] to give it 104 [acres] and[,] at the time[,] on [the] hundred acres, no we were not paid in full."); N.T., 8/29/12, at 67 (wherein R. Ferris confirmed his deposition testimony that "the agreement was[,] when everybody was paid in full[,] the names would be transferred to the deed."), 70 (wherein R. Ferris testified that he and Ferris signed the deed, "with the agreement that their [the members'] names would go on later.").

Thus, the record supports the trial court's determination that the oral agreement included the direct transfer of shares of the Property and the Adjacent Property to each of the Plaintiffs, in their own names and for their proportionate shares. *See* Trial Court Opinion, 1/11/16, at 27-28. We discern no error or abuse of discretion on the part of the trial court in this regard. Accordingly, Ferris's claim lacks merit.

Regarding Ferris's assertion of estoppel by deed, Ferris claimed that he was "induced to buy the land on the premise that he and his brother would own it as joint tenants[,] and he relied upon this not knowing that meanwhile[,] his brother ha[d] talked several other friends into giving him money for an interest in the land." Brief of Appellant (No. 1131 MDA 2016) at 32-33.

Under the doctrine of estoppel by deed,

- 12 -

> [w]here one conveys with a general warranty land which he does not own at the time, but afterwards acquires the ownership of it, the principle of estoppel is that such acquisition inures to the benefit of the grantee, because the grantor is estopped to deny, against the terms of his warranty, that he had the title in question.

*Shedden v. Anadarko E. & P. Co., L.P.*, 136 A.3d 485, 490-91 (Pa. 2016) (citation omitted).

In its Opinion filed on June 28, 2016, the trial court "found [] Ferris to be generally not credible as to the ultimate issue, given his own contrary oral and written statements, recognizing Plaintiffs as investors." Trial Court Opinion, 6/28/16, at 1. The trial court, as fact-finder, was free to believe "all, part[,] or none of the evidence presented." *Ruthrauff, Inc. v. Ravin, Inc.*, 914 A.2d 880, 888 (Pa. Super. 2006). As the trial court's findings are supported in the record, and its legal conclusions are sound, we cannot grant Ferris relief on this claim.

In his third issue, Ferris argues that the trial court improperly considered an untimely Motion for Reconsideration, and then erred when it modified/amended its earlier Order beyond the 30-day mandatory time limit. Appellant's Brief (No. 1619 MDA 2016) at 19. Ferris contends that the trial court's Order of January 7, 2016 was a final Order, and that any modification of that Order was required to be made within 30 days after its entry. *Id.* Ferris further argues that the trial court erred when it granted Plaintiffs' Motion to Enforce, by an Order entered on September 16, 2016, after Ferris

had filed his Notice of Appeal, and where reconsideration had not been expressly granted. *Id.* at 20-21.

Ferris filed his post-trial Motion for a new trial on January 26, 2016. The Motion was denied by operation of law on May 25, 2016. *See* Pa.R.C.P. 227.4(1)(b) (requiring the Prothonotary to enter judgment, upon praecipe of the party, if the trial court "does not enter an order disposing of all [post-trial] motions within one hundred twenty days after the filing of the first motion"). Plaintiffs filed a Praecipe to enter judgment on May 31, 2016. However, judgment was not entered. On June 27, 2016, the trial court entered an Order denying Ferris's Post-Trial Motion, and Ferris timely filed an appeal of that Order.[7] Although judgment was not entered, we will consider as done, that which should have been done. *See McCormick v. Northeastern Bank of Pennsylvania,* 561 A.2d 328, 330 n.1 (Pa. 1989) (although order dismissing appellants' motion for post-trial relief was not reduced to judgment, the court would regard as done "that which ought to have been done," in the interests of judicial economy) (citation omitted)).

"The time within which a trial court may grant reconsideration of its orders is a matter of law[.]" *Mfrs. & Traders Trust Co. v. Greenville Gastroenterology, SC*, 108 A.3d 913, 917 (Pa. Super. 2015) (citation

---

[7] As this Court has long recognized, an appeal properly lies from the entry of judgment after the trial court disposes of post-verdict motions, not from the verdict or an order denying post-trial motions. *Johnston the Florist, Inc. v. TEDCO Const. Corp*., 657 A.2d 511, 514 (Pa. Super. 1995).

- 14 -

omitted). Section 5505 of the Judicial Code states, in relevant part, that "[e]xcept as otherwise provided or prescribed by law, a court upon notice to the parties may modify or rescind any order within 30 days after its entry, … if no appeal from such order has been taken or allowed." 42 Pa.C.S.A. § 5505.

> The 30-day appeal period is tolled only by a timely order expressly granting reconsideration of the final appealable order. Concomitantly, either the lapse of 30 days beyond the date of entry of an original order, or the filing of a notice of appeal will vitiate the jurisdiction of the trial court to modify, alter, or otherwise proceed further in the matter. Thus, [i]f a trial court fails to grant reconsideration expressly within the prescribed 30 days, it loses the power to act upon both the petition [for reconsideration] and the original order. These principles are premised upon application of 42 Pa.C.S.A. § 5505 ….

***Gardner v. Consol. Rail. Corp.***, 100 A.3d 280, 283 (Pa. Super. 2014).

We additionally are cognizant that Pennsylvania Rule of Appellate Procedure 1701 provides that, once a common pleas court enters a final order and an appeal is filed, the court cannot subsequently modify or amend that order. Pa.R.A.P. 1701.

Here, the trial court did not expressly grant reconsideration within 30 days following its June 27, 2016 Order, which denied Ferris's Post-Trial Motion. Further, Ferris had filed a Notice of Appeal, divesting the trial court of jurisdiction. Because the trial court lacked jurisdiction to enter its August 23, 2016 and September 16, 2016 Orders, we conclude that those Orders

are void.  *See Gardner*, 100 A.3d at 283; *see also* 42 Pa.C.S.A. § 5505; Pa.R.A.P. 1701.  We therefore vacate the trial court's Orders entered on August 23, 2016, and September 16, 2016.

In his fourth and fifth claims of error, Ferris argues that the trial court imposed unreasonable time constraints on the presentation of his case during trial.  Brief of Appellant (No. 1131 MDA 2016) at 33-34; Appellant's Brief (No. 1619 MDA 2016) at 19.  Ferris contends that the trial court improperly imposed a one-hour time limit for his testimony, which was manifestly unreasonable.  Brief of Appellant (No. 1131 MDA 2016) at 34. Ferris asserts that as a result of the trial court's limitation, he was deprived of due process, in violation of the Pennsylvania and United States Constitutions.  *Id.*  Ferris further argues that, because he was not given an opportunity to challenge R. Ferris's testimony, "he was not afforded the protections afforded to him under statutes governing Limited Liability Companies … and was denied due process of law."  *Id.* at 36-37.

Pennsylvania law provides a trial court with broad power and discretion to limit the number of witnesses whose testimony is similar or cumulative as well as any cumulative evidence presented to a jury.  Pa.R.C.P. 223(1).

Upon review, we cannot conclude that the trial court abused its discretion.  Contrary to Ferris's assertion, the record reflects that Ferris began testifying on August 21, 2014, continued testifying the full day of December 22, 2014, and concluded his testimony on April 30, 2015, during

the time allotted. On April 30, 2015, the trial court set the schedule for

Ferris's testimony for that day as follows:

> THE COURT: … I believe, while I do not have a transcript of the last hearing because it has not been prepared as yet, I believe, [Francis] O'Connor[, Esquire ("Attorney O'Connor")], your client was on the stand and you were in the midst of direct examination.
>
> ATTORNEY O'CONNOR: That's correct, Your Honor.
>
> THE COURT: I believe your client has been on the stand at least a day and a half, if not two days, so please—I will give you an hour. Proceed.

N.T., 4/30/15, at 3-4. At that time, Attorney O'Connor lodged no objection.

Later, as Ferris presented cumulative testimony, the trial court advised

Attorney O'Connor not to duplicate matters already in the record. ***See id.*** at

36 (wherein the trial court advised Attorney O'Connor that "[i]f this is

already in the record[,] we do not need to go over it again" and "[t]he

record will speak for itself"); 43 (wherein, upon Attorney O'Connor inquiring

as to reasons for titling the Adjacent Parcel in Ferris's name, and the

objection of Plaintiffs' counsel, the trial court stated, "[w]ell, again, that's

the subject of a lot of testimony that has already been given. If this is

something new, [Attorney] O'Connor, I will hear it. If it is not, move on.").

Ferris offers no detailed explanation of what testimony he was prevented

from providing, or how that testimony would have influenced the outcome of

the proceedings. Ferris states only that the trial court "excluded evidence

that tended to show that [Plaintiffs] had not met their burden with respect to

- 17 -

proving that there was an oral agreement sufficient to overcome the Statute of Frauds." Brief of Appellant (No. 1131 MDA 2016) at 34. Because Ferris's claim is not supported in the record, we cannot grant him the relief requested.

For the foregoing reasons, we affirm the June 27, 2016 Order entered by the trial court, which denied Ferris's Post-Trial Motion. The trial court's Orders of August 23, 2016 and September 16, 2016 are void and, therefore, vacated.

The Order of June 27, 2016 is affirmed; the Orders entered on August 23, 2016 and September 16, 2016 are vacated. Superior Court jurisdiction is relinquished.

Judge Moulton joins the memorandum.

Judge Solano concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/21/2017

- 18 -

HARRY J. LAFFERTY, et al.  
        Plaintiffs,

v.

THOMAS D. FERRIS  
        Defendant.

: IN THE COURT OF COMMON PLEAS  
: OF SUSQUEHANNA COUNTY,  
: COMMONWEALTH OF PENNSYLVANIA  
:  
: CIVIL ACTION  
:  
: NO.: 2008 – 1941 CP

## OPINION

### I.    INTRODUCTION

Harry J. Lafferty, Michael D. Kirn, Robert T. Kirn, John J. Roedell, John M. Ferris, and Robert F. Ferris (hereinafter collectively "Plaintiffs") initiated a cause of action against Thomas D. Ferris (hereinafter "Defendant") on December 28, 2008.

Defendant, however, specifically disputes that he was ever even a member of Facowee Acres or that any oral agreements existed in relation to reforming the deed to reflect Facowee Acres as the true owner of the properties. See N.T., 8/21/2014, p. 12 ¶¶ 4-9; p. 144 ¶¶ 10-13.

As a result of this disagreement, Plaintiffs filed a Complaint against Defendant on December 28, 2008 in the Court of Common Pleas of Susquehanna County. The claims in the Complaint included the following: (1) Reformation of Deed; (2) Unjust Enrichment; (3) Promissory Estoppel; and (4) Breach of Contract.

Defendant filed Preliminary Objections to the Complaint on February 9, 2009. Defendant alleged a multitude of objections including, that Plaintiff "failed to specifically state the terms of any agreements, promises or statement alleged to have been made," that "the complaint fails to set forth the exact terms of the specific promise(s) made," and that Plaintiff failed to allege many averments with legal sufficiency.

Consequently, on March 3, 2009, Plaintiffs filed Responses to Defendant's Preliminary Objections.

Then, on April 3, 2009, Defendant filed an Answer to Amended Complaint. The Answer included a Counterclaim that averred no specific cause of action against Plaintiffs but requested the relief that: (1) the Court decree a fair and equitable partition of the property, and (2) the shares of the respective parties be set out to the appropriate parties and if no partition were possible, then sale of the property.

Plaintiffs filed an Answer to Counterclaim that included New Matter on April 30, 2009.

On May 8, 2009, Defendant then filed an Answer to New Matter.

Almost a year later, Defendant filed a Petition for Rule to Show Cause on February 16, 2010. This Petition addressed $297,000.00 that was held in a trust account in relation to an oil and gas lease entered into by Defendant and Plaintiff, Robert F. Ferris. The Petition requested that the money in the trust account held by Plaintiffs' attorney be released.

Plaintiffs filed a Response to Petition for Rule to Show Cause on March 8, 2010.

As a result of the Petition and Response, this Court filed an Order holding that the monies in said trust account be paid over to the Susquehanna County Prothonotary's Office to be held in an interest-bearing account until further order of Court.

Several discovery pleadings and orders were thereafter filed.

On June 10, 2011, Plaintiffs filed a Praecipe for Trial.

Consequently, a pre-trial conference occurred on July 12, 2011.

On August 16, 2011, Plaintiffs filed a Motion for Protective Order Restricting Dissemination of Private Information Gathered in the Discovery Process.

On August 23, 2011, Defendant filed an Answer to Plaintiffs' Motion for Protective Order.

On October 11, 2011, this Court filed an Order granting the Protective Order.

3

Then, on October 21, 2011, this Court filed another Order denying Defendant's Petition for Allowance to Amend Answer.

Defendant then filed another more specific Amended Answer Petition.

On November 1, 2011, in response to Defendant's Motion for Jury Trial, this Court filed an Order stating that because the Complaint includes a Count for reformation of deed, which sounds in equity, there is no absolute right to a jury trial. Moreover, we found that the issues are complex and the facts are unsuitable to be determined by a jury.

On November 3, 2011, Plaintiffs filed an Answer to Defendant's Amended Answer Petition.

This Court granted the Amended Answer Petition on November 3, 2011.

Then, on November 8, 2011, Defendant filed a Petition for Reconsideration of the Order concerning the right to a jury trial.

Defendant filed Amended Answers to Second Amended Complaint on November 14, 2011.

As a result, Plaintiffs filed an Answer to Defendant's New Matter Contained in Defendant's Amended Answers to Second Amended Complaint.

Defendant filed a Motion for Summary Judgment that was dismissed on April 24, 2015 because we found it to be untimely filed so as to delay the start of the impending judge trial.

The judge trial on the matter commenced on April 30, 2012 and continued on the following dates: August 29, 2012; August 5, 2013; December 5, 2013; February 24, 2014; May 9, 2014; August 21, 2014; December 22, 2014; and April 30, 2015.

On the final day of the judge trial on April 30, 2015, Plaintiff orally requested the following:

4

(1) that the Court order specific performance of the conveyance of the entire 104.4-acre

tract of land by way of the delivery of a special warranty deed of the property by

Defendant within thirty (30) days of the date of this Opinion;

(2) for Defendant to pay all amounts due on the unpaid mortgage;

(3) the release of the monies held by the Susquehanna County Prothonotary's Office to

Facowee Acres, LLC;

(4) for Defendant's counterclaim in partition of the property to be dismissed; and

(5) for costs and such other relief as the Court deems appropriate be awarded to Plaintiff.

See N.T., 4/30/2015, p. 72 ¶¶ 6-18.

Defendant, however, requested that the Court establish the fair amount of damages to

which Defendant is entitled, but in the alternative if damages cannot be determined, then to assist

in partition of the property. See N.T., 4/30/2015, P. 83 ¶¶ 3-10.

Upon review of the extensive filed pleadings, arguments, hearings, and judge trial held on

the matter and based on the reasons set forth in the instant Opinion, this Court determines the

following.

II.     FINDINGS OF FACT

The dispute essentially involves ownership of real property located in Susquehanna

County. Plaintiffs claim that they, along with Defendant, have been members of a limited

liability corporation known as "Facowee Acres" since August of 1998. In October of 1998,

Plaintiffs claim that both Plaintiffs and Defendant elected to acquire approximately one-hundred

(100) acres of land in Susquehanna County to be used by the members of Facowee Acres as a

hunting lodge. Plaintiffs allege that each of the members of Facowee Acres orally agreed to

contribute to the purchase price of the property and the related costs over time. See N.T.,

5

4/30/2012, p. 17 ¶¶ 23-25; p. 18 ¶ 1. Then, upon completion of payment of that share of the property, the members intended to convey the property to Facowee Acre, LLC. See Id. at p. 18 ¶ 2-4. The property, however, was deeded solely to Plaintiff, Robert Ferris, and Defendant, Thomas D. Ferris.

Additionally, Plaintiffs allege that the members of Facowee Acres agreed to purchase an adjacent 4.4 acre property to be used in addition to the original property. The second parcel was purchased only by Defendant, Thomas D. Ferris.

On October 28, 2004, a deed was executed solely by Plaintiff, Robert F. Ferris, and Defendant consolidating both parcels under a single deed, which was recorded on November 4, 2004 by the Susquehanna County Recorder of Deeds as Instrument Number 200411182.

During his testimony during the judge trial, Plaintiff, John Roedell, discussed the issue of the parties to the deed upon his attorney's questioning:

Q: What was your understanding of this whole transaction, Mr. Roedell, with--- involving the property and paying for it?

A: Basically, it was monthly payments. When everybody was paid in full, the deed would be transferred into everyone's name.

Q: Okay. Now, again—and the LLC was formed?

A: Correct.

Q: And—and what [sic] was the LLC formed?

A: For the purchase of the property ...

N.T., 12/5/2013, p. 226 ¶¶ 20-25; p. 227 ¶¶ 1-4.

Moreover, after acquiring the property, Plaintiffs allege that all parties utilized the land. Plaintiff, Robert Ferris, specifically stated during his testimony at the judge trial in response to questions from his counsel:

6

Q: ... Have you hunted on the property?

A: Yes.

Q: And have the members made use of the property?

A: Everyone has.

Q: Including the Defendant?

A: Yes

N.T., 4/30/2012, p. 79 ¶¶ 18-23.

Furthermore, in response to questions from the Court during his testimony, Plaintiff, Robert Ferris, discussed improvements made to the property:

THE COURT: You said you put a well in [the property]?

MR. FERRIS: Yeah, we had a well put in and holding tank for our --- ... septic.

THE COURT: Who paid for that?

MR. FERRIS: All the members. All --- my brother.

THE COURT: You put a driveway in there?

MR. FERRIS: Yes, we did, your Honor.

THE COURT: Who paid for that?

MR. FERRIS: It's on the expense breakout. Everybody here did. We put an addition on, Your Honor, everybody here worked on it and did it. I mean it was a group effort on everything.

Q [Plaintiff's counsel]: They're all getting use of this property?

A: Yea, we were all members. Yes. It was an agreement.

Q: They could come up and use it any time?

A: Yes.

7

N.T., 4/30/2012, p. 257 ¶¶ 19-23; p. 258 ¶¶ 6-23.

Around May 1998, Robert Ferris along with Thomas Ferris and four others had a meeting about buying real property of John McGavin.

In about, August 20, 1998, Robert F. Ferris, brother of Defendant, Thomas D. Ferris, was instrumental in forming a limited liability company, Facowee Acres, LLC, for the purpose of purchasing real property for the members of a group to hunt thereon. The LLC was filed with the Pennsylvania Department of State at that time.

At the time of the formation of Facowee Acres, LLC (Facowee) there were six original members – Michael Kirn, Robert Kirn, Robert Ferris, John Ferris, John Roedell and Thomas Ferris. Their first formation meeting occurred May, 1998. The hunting friends had talked about buying property for years.

On behalf of the original six members of Facowee, Robert F. Ferris approached a John McGavin, owner of a substantial amount of real property in Auburn Township, Susquehanna County, Pennsylvania. Early on McGavin agreed to sell all of the real property he and his wife owned there but later reneged on the offer but did agree to sell about one hundred acres of land on the other side of the road of his residence. To that end an agreement of sale dated October 4, 1998 was drawn up with John McGavin and Regina McGavin as sellers, and Facowee Acres, LLC as the buyer of the 100 acres. A deposit of three thousand dollars ($3,000) was placed down for the deal which had a closing date of November 15, 1998. John Roedell had seen the property.

A second agreement dated October 4, 1998, was executed by John A and Regina M. McGavin as sellers and Facowee Acres, LLC, with a purchase price of seventy thousand dollars, ($70,000). It notes a security deposit of three thousand dollars ($3,000) paid and a balance due at

8

closing of twenty thousand dollars ($20,000), additionally, the document provided for a mortgage for four (4) years.

At the closing, occurring on December 30, 1998, a deed was tendered by the McGavins to Robert F. Ferris and Thomas D. Ferris as grantees. Because the closing was scheduled between Christmas and New Years, none of the other members of Facowee Could make it up to the closing, and so the real estate attorney prepared the deed to grantees, Robert Ferris and Thomas Ferris, which was acceptable to all members of Facowee as Ferrises were going to change it over (to Facowee) after everyone paid their share.

The membership of Facowee increased from the original six members listed above plus Kevin Hulme and Thomas Miller who joined in November 1998, plus Harry Lafferty who joined Facowee in 2000.

Required shares to be paid consisted of one ninth of the $70,000 plus carrying cost and all operating costs associated with the real property.

At the closing of December 30, 1998, the final terms had changed so only $10,000 was additionally put down on the real estate transaction and the mortgage entered onto by Robert and Thomas Ferris as mortgagors and McGavins as mortgagees was in the amount of fifty-seven thousand dollars ($57,000). The mortgage to McGavins was duly paid in full.

An additional four acres, more or less, adjacent to the one hundred acre parcel was purchased by deed dated November 5, 1999. Previous discussions by the members of Facowee were that any purchase of future property adjacent to the one hundred acres would be added on and would be paid through the Facowee account. The deed was conveyed to Thomas Ferris who was to be reimbursed by the members of Facowee by depositing monies into the Facowee account.

9

Subsequent to the purchase of the four additional acres, the property was deeded to both Thomas D. Ferris and Robert F. Ferris, the same named grantees of the one hundred acre parcel along with the hundred acre parcel for clean and green real property assessment benefits of lower taxation.

Facowee members held infrequent meetings at which times members discussed supplies needed, septic tank installation, driveway construction, building additions among other things. The members generally agreed upon these things and left Robert Ferris to carry them out.

Amounts paid in by members of Facowee and amounts paid out in connection with the purchase and use of the real properties were deposited in and paid out through an account of through an account of Robert Ferris and his wife through the Police and Fire Credit Union, located in Philadelphia, PA. Robert Ferris' wife's name was added about 2005. The members of Facowee knew of this account and approved of its use for the transactions relating to Facowee.

At one time Thomas Ferris requested that his share in Facowee be bought out and so Robert Ferris prepared a document in about 2007 showing the members respective accounts.

The accounting, in part, shows that as to the $3,000 deposit monies it had been collected from the six original members of Facowee in 1998. However, Thomas Ferris had paid no monies of the three thousand dollar deposit made to McGavins for the initial purchase of the one hundred acres, more or less, Robert Kirns, Michael Kirns, John Roedell and John Ferris each paid seven hundred of this amount. The check endorsed by McGavins was signed by Robert Ferris c/o Facowee Acres.

The accounting and testimony further shows that of the ten thousand dollars ($10,000) paid to the McGavins at settlement, half came from Robert Ferris and half came from Thomas Ferris. John Ferris deposited $1,336.00 into the credit union account to cover closing costs on

10

the one hundred acre parcel. These monies were contributed by the three Ferris brother on behalf of Facowee, at a time each was a member thereof.

On June 30, 1999, a check from the credit union account was paid over to McGavins, said check in the amount of $5,046.00, representing principle and interest on the mortgage back to McGavins. These monies came from the members of Facowee. Members before and after made payments into the credit union account either by check or inter account transfers to cover expenses of Facowee regarding the purchase and ongoing costs of the real property.

Members of Facowee deposited monies into the said account monthly or in lump sums, from which the mortgage was paid to McGavins each June 30 and December 30 until paid in full.

Real estate taxes were paid out of the monies of the account to the tax collector. These taxes paid were for both of the subject parcels.

The November 23, 2007, accounting document prepared by Robert Ferris at the request of Thomas Ferris who by letter sought to be bought out of Facowee Acres shows the individual deposit accounts of the various members of Facowee.

Presently, Thomas Ferris has not yet paid his full share into the Fawowee account. All Plaintiff members have paid their accounts in full.     .

Robert Ferris stated on the record a number of times that the real properties in question were to be deeded over to Facowee upon the payment of the mortgage of McGavins.

Thomas Ferris received a credit in 2002 to his member account in the amount of $3,732.00 which was the purchase price of the 4.4 acres from Rose Korzakowski.

Thomas Ferris, Robert Ferris, John Roedell, Robert Kirn, Harry Lafferty, John Ferris and Kevin Hulme all attended a meeting. All were members of Facowee on the meeting date of

11

January 29, 2000, except for Harry J. Lafferty, who became a member at that meeting. At the meeting the members discussed sale of timber from real property. In particular it was discussed the possibility of using an adjacent landowners property to transport timber out in that a swamp existed in the subject acreage. A resolution to utilize the monies from the timber to repurchase the 4.6 acres from Thomas Ferris was voted on and approved by the members present of this 2000 meeting.

All members have used the subject properties for hunting, including Thomas Ferris.

Thomas Ferris refuses to deed over the subject real property to Facowee. However, Robert Ferris recognizes the agreement to transfer the realty to Facowee and is prepared to do so.

In what the Court would term as an exercise of bad judgment,t Robert Ferris and Thomas Ferris utilized the subject real properties as collateral for an equity line of credit afforded to them only. The initial line of credit was in the amount of $125,000 for which both Robert Ferris and Thomas Ferris executed the required borrowing documentation at the time of the obtaining of the equity line of credit. None of the other members of Facowee had any knowledge of the borrowing transaction of Robert Ferris and Thomas Ferris with Wachovia Bank. Robert Ferris paid the $50,000 back to Wachovia on or about April 10, 2007. Presently, whether or not Thomas Ferris has paid Wachovia in full is unknown.

Additionally, in an exercise of poor judgment, upon being solicited by natural gas prospecting companies, Robert Ferris and Thomas Ferris, named grantees on the deed, on or about August 26, 2008, entered into a natural gas agreement/lease with Chesapeake at $2850.00 per acre up front monies. Eventually by Court intersession the monies came into an escrow account held by the Susquehanna County Prothonotary at a banking institution where they remain pending resolution of the indirect matter. The initial payment made by Chesapeake was

12

in the amount of $287,500. It is Robert Ferris' representation to the Court that he was acting on behalf of Facowee when he executed the gas lease with Chesapeake. As such he desires the Court to distribute the monies deposited in regard to the lease and additional interest be distributed to Facowee Acres, LLC.

At one time, Thomas Ferris, had prepared an operating agreement which was captioned Facowee Acres. The proposed agreement was in an E-mail of Defendant, Thomas Ferris.

Additionally, an Attorney Fancians prepared some proposed by-laws.

Although Facowee members continued to operate through its members, it did not do so through a written agreement or written by-laws.

A mobile home, house trailer was given to Facowee Acres, but titled to Robert Ferris in 1998, or 1999.

The timber agreement was entered into on September 9, 2002, for which a check was received in the amount of $17,212.50. Both Robert Ferris and Thomas Ferris endorsed the said check and it was deposited into the account at the credit union which was being used to deposit monies into and pay out monies for the purchase and operational expenses of the subject premises including the hunting activity of Facowee members.

As to the reconciliation document of November 2007, noteworthy is the fact that listed among members paid in full is Harry Lafferty who tendered a check in the amount of $4988.00. The same accounting demonstrates that as of November 2007, Thomas Ferris owed $9972.00 for his member's share of Facowee. Robert Ferris, keeper of the accounting, estimated that as of the trial date Thomas Ferris would owe approximately $14,000 total on his account with Facowee, and upon payment of said amount would be entitled to one-ninth ownership of subject properties.

13

Kevin Hulme, informed by Robert Ferris that he was behind in his membership payments, opted to withdraw as a member of Facowee and forfeit monies paid. Upon being offered the share of Hulme at a meeting of Facowee all others declined to assume further payment of the share of Hulme, save Robert Ferris who made the future payments, thereby picking up an additional 1/9 interest in Facowee.

Additionally Thomas Miller, who had been involved in a car accident lived rent free in Robert Ferris' home for four years and agreed to tender his share to Robert Ferris in lieu of paying rent to Robert Ferris.

As a consequence of Hulme's and Miller's collective actions, Robert Ferris became entitled to three of nine shares of Facowee.

Robert Ferris arranged for the members and/or additional persons of their families to work on two side jobs of cutting timber and landscaping. The payment received for these jobs were credited to the Facowee members' accounts equally per oral agreement.

During the course of events, a water well and septic system were constructed upon the real property, the costs which were charged to the Facowee members. Additionally, an addition was constructed to the premises on the real property. The Plaintiffs, members of Facowee, worked on the addition project.

On October 4, 1998, McGavins by a signed letter agreed to sell 100 acres to Facowee Acres. Robert Ferris signed for Facowee Acres.

At one point Thomas Ferris in 2007 sought to be bought out, set a fair market valuation of $250,000 for the real property prior to the gas leasing. He rejected the buyout offer of the other members.

14

John Roedell, a member of the LLC known as Facowee Acres, LLC since 1998, agreed with the testimony of Robert Ferris as to the ownership of the (real) property. His statement was, "Basically, it was monthly payments. When everybody was paid in full, the deed would be transferred into everyone's name." NT 12-5-13 page 227, lines 23-25.

Roedell agreed with Rob Ferris's handling of the affairs of the LLC. Roedell stated at the trial that he was not at the closing in December because he had family obligations. He understood that the property was going to be put in the names of Rob Ferris and Tom Ferris, and was okay with that. See N.T. 12/5/13, ¶ 229 lines 1-12.

Roedell believed the agreement for the transfer of deed upon full payment was a gentlemen's agreement with the persons he knew since grade school.

Roedell's payments into Robert Ferris were by check with the memo – mountain house.

Roedell had no objections to Robert Ferris acquiring the share of Kevin Hulme, he knew Hulme and knew that Kevin wanted out. Additionally Roedell knew Robert Ferris acquired Thomas Miller's share. Roedell knew of no member who objected to the acquisition of the said shares by Robert Ferris.

On Monday, January 15, 2007, Thomas Ferris transmitted to John Roedell an email directing him to forward his (Thomas Ferris') email which in part stated, "as a follow – up to my voicemail last night, the hunting property will be repossessed by Wachovia Bank this month and I wanted to let everyone know that invested month in the property they reasons why we are in the situation."

Further the correspondence of January 15, 2007 from Thomas Ferris stated, "I have my $50,000.00 ready for the past two years to pay off the loan and then get everyone's name on the property deed."

Further, Thomas Ferris wrote, "This loan is the reason why no one can have their name added. It's a lean (sic) against the property."

Tom Ferris never told John Roedell that he was not going to be the (an) owner of the property.

Sometime right before the December 30, 1998, settlement date, Roedell learned the real estate would be titled in the names of Robert Ferris and Thomas Ferris, and that did not cause him any concern.

On November 19, 2007, John Roedell transmitted an email to Thomas Ferris, which read as follows: "Tom, we were trying to satisfy your quest from a previous email stating your desire to be out of the camp. We have done our due diligence and it's time for you to present your concerns. We need to move forward on this matter and get it resolved one way or another. Thanks. John Roedell."

Roedell believed that he had an ownership of the 4.4 acre parcel titled in Thomas Ferris' name through the transfer of monies to Thomas Ferris from the timber sale proceeds. That as a result the 4.4 acre parcel was to be transferred to Facowee Acres.

At a meeting of Facowee acres held on January 29, 2000, according to the minutes, attended by Robert Ferris, Thomas Miller, John Roedell, Thomas Ferris, Robert Kirn, Harry Lafferty, John Ferris, and Kevin Hulme, late arrival, the meeting members as allocation of funds of a timber sale provided for a repurchase of 4.6 acres from Thomas D. Ferris at 2.1 – 2.2. The members present at said meeting voted on an approved the repurchase of the 4.6 acres parcel of Thomas Ferris by timber sales profit.

Robert Kirn, a member of Facowee Acres since 1998, agreed that the ownership of the subject real property in Susquehanna County was to be titled in Facowee Acres, LLC. Further

16

that the realty would be used for a hunting club for Facowee and titled in Facowee Acres once all members had paid up. Lastly, Robert Kirn was okay with Robert Ferris and Thomas Ferris going to the initial real estate closing on December 30, 1998. Robert Kirn made payments to the credit union account of Robert Ferris for payment for purchase of the subject property by transfers of monies from his and Donna Kirn's account into Robert Ferris' account. On some records of transfer was the word "Mountains" indicating the payment was made for the mountains – the subject real property.

Robert Kirn expected that the members of Facowee Acres, LLC would make the payments and then they would own the property.

Robert Kirn confirmed the facts that Thomas Miller and Kevin Hulme dropped out of membership in Facowee Acres, and that their interests were picked up by Rob (Ferris). He agreed that this acquisition of shares by Robert Ferris had been discussed by members and agreed upon by the Facowee members. Thomas Ferris did not object to Robert Ferris' acquisition of the shares of Miller and Hulme.

Tom Ferris never informed Robert Kirn that Kirn was not going to be an owner of the subject real estate.

Harry Lafferty, a member of Facowee Acres, LLC since 2000, agreed that the subject real property would be transferred to Facowee Acres upon the payment in full pursuant to the members' agreement. Lafferty agreed with Robert Ferris' handling of the payments transactions by the members. Lafferty was friends with others of Facowee Acres, and had hunted with them for a few years before he joined Facowee Acres, LLC. It was his agreement to pay for his share of the Susquehanna County property. Harry Lafferty made all required payments for said purchase, by monthly money orders or otherwise. Additionally, Lafferty wrote a check number

17

126, on or about August 2002, in the sum of $2,765.00 toward his share. Said check was written out to Thomas Ferris with the understanding it would be transmitted to Robert Ferris for payment of Lafferty's share.

Harry Lafferty, along with the other members was asked if he wanted a share – pertaining to Miller and Hulme, but could not afford to purchase either shares. He was alright with Robert Ferris acquiring the shares. He noted no member objected to Robert Ferris' acquiring such shares.

Harry Lafferty approved of the gas leasing of the subject real estate, noting the leasing was probably talked about by the members.

Thomas Ferris never informed Harry Lafferty, whom he knew since they were kids, that Facowee Acres, LLC would not be an owner of the subject Susquehanna County real property.

Harry Lafferty was present at the meeting of January 29, 2000, wherein it was agreed to allocate a portion of the timber funds for purchase of the 4.6, 4.4 acres from Thomas D. Ferris. The timber sale likewise was voted upon and approved by the members present.

At the January 29, 2000, meeting Lafferty became a member of Facowee Acres. He believed that either Robert Ferris or Thomas Ferris kept the minutes of that meeting.

John M. Ferris, brother of both Robert Ferris and Thomas Ferris is a member of Facowee Acres, LLC since its inception. John Ferris absolutely agrees with the handling of the financial transactions for Facowee Acres, LLC, by Robert Ferris. Like the other members of Facowee Acres, above discussed, John Ferris understood that since the members were paid in full, their collective names would go on the deed for the subject 104 acres and then be conveyed to Facowee Acres.

18

John Ferris, along with other members had been searching for hunting property for years, even going up to Erie County for the purpose in the 80's. That included Rob Kirns, Mike Kirns, John Roedell, Thomas Ferris, Robert Ferris, and John Ferris, himself.

John Ferris made payment for the purchase of the subject realty, the payments having been made to Robert Ferris. On some of his checks tendered to Robert Ferris were notations such as FAC LLC and Mountain house. John Ferris also made inter account transfers of monies to Robert Ferris through the credit union.

Because John Ferris trusted his brothers Robert and Thomas, and he had little children at the time of the December 1998 closing he did not attend. However, he paid closing costs for the purchase of the former McGavin 100 acre parcel.

Payments by members were made for the principal of the loan as well as for operating costs such as a new deck added to the property, new refrigerator – everything.

Thomas M. Ferris, as if on cross examination, although agreeing that he and Robert Ferris were and are the record owners of 104.4 acres of real estate located in Susquehanna County, contends that the 4.4 acres was his only and could not be part of the claim as he contends it was not shares that Robby paid him for it. He suggests there was an agreement that Robby would pay his one-half for the 4.4 acres.

Thomas Ferris stopped hunting on the 104 acres in about the year 2006.

An email from Thomas Ferris to Robert Ferris dated Sunday, September 17, 2006, in relevant part read, "You know, I don't want to get anyone involved in our problem, but if you don't provide me with a status or a solution, I will be requesting a meeting with everyone involved in the hunting cabin via a personal letter/email explaining the Wachovia loan situation."

19

To a question concerning requesting a meeting with everyone involved in the hunting cabin, Thomas Ferris replied, "We had a lot of meetings with the hunting cabin, See N.T., 8/21/94, P. 32, ¶¶ 2-6

In the email of September 17, 2006, Thomas Ferris also stated, "a few years, Rob and I decided to take a home equity loan against Facowee property in the amount of $100,000 without anyone's approval." Said correspondence of Thomas Ferris further reads, "The reason for my request is simple, I have my share and want to paid it off as to not affect everyone's position within the camp."

A further paragraph in the email correspondence of September 17, 2006 reads, "We as a group nee to meet ASAP in an effort to resolve this loan situation since it's in ---"since it affects everyone's interest in Facowee."

Additionally the same correspondence provided in part, "Unfortunately, my 2 options are as follows: 1. Get everyone who has ownership in Facowee Acres involved"

Additionally, the correspondence goes on to state ""or" and then there's a number 2, Have Wachovia repossess the property, which would cause everyone to lose their position in Facowee... (This is my best options and I would never want this to happen, but Rob leaves me no option".

An email dated January 15, 2007 with a greeting ending Tom Ferris to John Roedell provided, John, I only have your email address, no Mike Kirn or Harry Lafferty. If you could email over Harry and Mike Kirn's email, I would like to follow-up with them regarding my voice mail last night....as a follow-up to my voicemail last night, the hunting property will be repossessed by Wachovia Bank this month and I wanted to let everyone know that invested money in the property, the reasons we are in this situation."

20

In further part the correspondence by email to Roedell provides, "I've been asking Rob for his share of $50,000.00 for the past 2 years and, with the assistance of Johnny for the past 2 years and, with the assistance of Johnny for the past year, and he's told each of us it was to be paid off on a number of occasions with the last being October 2006. Unfortunately, he hasn't come through and it's time to get everyone involved since it affects everyone's investment."

Further, at paragraph 4 same email to Roedell provides, "I have my $50,000.00 ready for the past 2 years to pay off the loan and then get everyone's name on the property deed. This loan is the reason who no one can have their name added, it's a lien against the property."

In a letter dated March 13, 2007 admitted by Thomas Ferris to have been written by him and then in subsequent testimony denied to have been written by him, laid out on Bicitis Group, Incorporated stationary where Thomas Ferris worked, addressed to John Ferris, the letter stated, "Also, everyone involved decided to have a meeting without me and since I'm an investor, I want out."

Thomas Ferris, despite various emails and other correspondence outlined above stated that the member had to pay to hunt. See N.T., 8/21/14, P. 72 ¶¶5-17

A document in the form of a letter dated March 13, 2007, indicates Thomas Ferris total investment in the subject real estate to be $11,750.52. See N.T., 8/21/14, P. 78 ¶¶11-21

An email dated Monday, September 18, 2006 from Thomas Ferris to Robert Ferris stated, "Rob …. I really don't care for you as a person, but you are/were my brother. I tried giving you more than one chance --- giving you more than one chance to resolve the hunting loan and you could care less. Unfortunately, we are responsible for 5 other people who trusted us to take care of their investment."

21

Further the September 18, 2006 email goes on, "I will let Johnny know tonight because he is my brother, that I'll be mailing out a letter to everyone involved, explain the situation and what has transpired since the loan (Wachovia) was taken out without their knowledge."

Thomas Ferris admitted that his brother Robert Ferris, in about December 1998, asked him to purchase land with him. Thomas Ferris denies that Robert Ferris advised him that others were involved with the purchase of such land. He also denies that Robert Ferris told him either that others had an interest in the land or that the land was being bought in trust for a group of other individuals. Lastly, Thomas Ferris denies that the other individuals' names would go on (the deed). He also denies that Robert Ferris ever advised him that he was accepting monies from the friends of both of them toward the purchase of land.

In about 1999, Thomas Ferris purchased 4.4 acres located adjacent to the larger parcel, the subject of the lawsuit, and had it titled solely in his name. Later, in about 2001-2002, Thomas Ferris and Robert Ferris executed another deed between themselves wherein the one hundred acre parcel and the 4.4 acre parcel were listed on one deed with both Thomas Ferris and Robert Ferris as grantees, joint tenant with the right of survivorship.

A proposed deed drawn up at the instance of Robert Ferris in about 2006, would have had Thomas Ferris transfer his interests in both parcels to Robert Ferris only. This proposed deed did not list any other individuals or an L.L.C. as grantees.

Subsequent to the purchase of the one hundred acre parcel Thomas Ferris sent Robert Ferris monies to pay on the mortgage that both had signed with the McGowans. Thomas Ferris puts the amount paid by him to Robert Ferris in the amount of $40,254.

Thomas Ferris also alleges that he paid either to Robert Ferris or in the form of unreimbursed expenses $14,216.

22

Thomas Ferris denies that Robert Ferris ever advised him that others would make monthly payments to him for the mortgage payment, and Thomas did not agree to such arrangement.

Thomas Ferris denies that any of the members say they were paying to Robert Ferris monthly payment for the subject land.

Thomas Ferris produced a document ostensibly to show that he was not at the membership meeting of January 29,    , but was at the Edelweiss Restaurant in the Pocono area of Pennsylvania.

Thomas Ferris alleged that he and Robert Ferris were the only ones who took care of the subject property.

Thomas Ferris and Robert Ferris in about September, 2007, entered into an agreement for the sale of timber from the subject property with a logger. The proceeds of approximately $17,000 were allocated by Robert Ferris to the various members of the hunting group, the plaintiffs as well as Thomas Ferris in an accounting of 2007 by Robert Ferris.

In 2007, Robert Ferris began negotiating with a natural gas company for a lease of the subjected properties. Subsequently, the two brothers entered into a gas lease with Chesapeake, after which the Court ordered the monies realized from the lease to be escrowed with the Susquehanna County Prothonotary.

Both, Robert Ferris and Thomas Ferris, forwarded monies to the local tax collector for the taxes due on the subject real estate. Additionally, they received income tax benefits as a result of such payments.

Thomas Ferris and Robert Ferris, as title owners of the subject real estate, unbeknown to the other members of the hunting club, took out a line of credit in the amount of $125,000 with

23

Wachovia Bank, of which they each received $50,000. Robert Ferris has paid his share back and Thomas Ferris owes at least six thousand dollars balance to Wachovia as to his share of the line of credit.

Thomas Ferris admits being part of a hunting club with eight other individuals and that all hunted on the subject property.

All plaintiffs, members of the hunting club admit that Thomas Ferris was a member of the organization.

Robert Ferris' accounting of November 23, 20047, shows that the various members of the hunting club paid various amounts to Robert Ferris over the course of the ownership of the subject property to 2007.

Thomas Ferris alleges that of the $40,254.00, he claims paid by him to Robert Ferris, some of that sum represented what he paid for the 4.4 acres for which he was not paid.

Thomas Ferris admits that the other members of the hunting club had use of the subject property "twenty-four seven, 365 days of the year".

Thomas Ferris agrees that an addition was put onto the mobile home brought onto the property, and that "we all went up there and did work on it".

In June 1999, a purported $1,000 loan of Thomas Ferris to Robert Ferris was used to in part pay the June '99 mortgage payment.

On December 30, 1998, Thomas Ferris inter-account transfer paid $5000 into Robert Ferris 001 account.

On April 9, 1999, Thomas Ferris paid over $4000 to Robert Ferris, ostensibly for a loan.

An expense of Thomas Ferris of $348 was for the survey of the 4.4 acres, paid to Butler Land Surveying.

24

Thomas Ferris also paid a sum of $3426.30 to Same Lewis, attorney, toward the closing of the 4.4 acre parcel.

On 10-25-99, Thomas Ferris paid into the 001 account of Robert Ferris $200 which apparently was a loan eventually paid back to Thomas Ferris, as a loan.

On July 7, 2000, $2000 was paid by Thomas Ferris into the 001 account of Robert Ferris.

A sum of $1500 was paid by Thomas Ferris to Robert Ferris in about September 30, 2000, according to Robert Ferris' records/accounting.

On December 5, 2000, Thomas Ferris paid $400 into the 001 account of Robert Ferris.

On October 16, 2003, Thomas Ferris caused to be deposited to 5501 account of Robert Ferris, the sum of $10,000.

On September 22, 2004, Thomas Ferris transferred by inter-account transfer $500 to Robert Ferris. Into an account of Robert Ferris, 1301, was deposited by Thomas Ferris, an amount of $1100, on or about.

On May 31, 20015, an amount of $2500 was transferred by Thomas Ferris to Robert Ferris account of 5501.

On June 24, 2005, Thomas Ferris transferred to Robert Ferris the sum of $2000 into account 31301.

On October 11, 2005, Thomas Ferris caused to be transferred to Robert Ferris, the sum of $1800 to account 31301.

On December 23, 2005, Thomas Ferris transferred the sum of $600 to Robert Ferris, account 63201.

Thomas Ferris claims a sum of $1019 owing to him from Robert Ferris relating to unpaid interest in connection with the Wachovia loan, secured by the subject property.

Thomas Ferris claims reimbursements for expenses paid on behalf of the hunting group: (1) $27.50 for breakfast sandwiches at a store near the hunting property; (2) $159.70 for a storm door for the hunting camp from Whipple Brothers in Laceyville, PA; (3)          for towing of Robs car upon breaking down while coming up to hunt; (4) $59.85 for a space heater for Robby's (Robert Ferris) hunting cabin/trailer; (5) $139.90 for deer processing at Dotti Lou's; (6) $101.35 for Motorola walkie-talkies for hunting purposes; (7) $22.45 for speaker wire to hook up speakers and television in the trailer at the hunting camp; (8) $26.49 for a coffee pot for the hunting trailer; (10) $83.10 for batteries for the walkie-talkies; $63.83 for reloading shells/muzzle loader season; (11) $1000 for a four wheel quad for use on the hunting property; (12)          for more powerful walkie-talkies for use at hunting property, purchased from Southern Communications; (13) $113.54 for painting supplies for use at hunting camp, purchased at Home Depot; (14)          for nails, plugs, shades for improvements to hunting trailer, purchased from Home Depot; (15) $4.69 for spray paint for hunting trailer, from K-Mart; (16) $19.82 for industrial bags for packing meat, purchased from Home Depot; (17) $76.84 for posted/No Trespassing signs; (18) $59.00 for a miter saw or sawzall used at the hunting camp; (19) $8.00 for extension cord used at hunting camp, purchased from Home Depot; (20) $43.94 for food basics for a hunting trip; (21) $23.35 for camp towels, rollers, paint etc. from Home Depot; (22) $46.88 for toilet paper and paper towel holders at camp, purchased from Restaurant Store; (23) $33.90 for shop lights for hunting camp purchased from Home Depot; (24) $42.90 for unknown purchased from Restaurant Store; (25) $106.00 for rental of brush hog from Gay's Hardware for hunting property use; (26) $55.51 for Home Depot; (27) $87.81 to Home Depot; (28) $36.77 for supplies for hunting property, purchased from Home Depot; (29) $108.50 for whiskey to an establishment/bar; (30) $93.96 for loppers to cut brush at hunting property;

26

for food plot seeds bought from Whitetail Institute for use at hunting property; (31) $4.64 for K-Mark; (32) $93.96 Home Depot; (33)               for  muzzle loaders and tree stands for use at the hunting property, purchased from Cabela's;  (34) $44.98 Home Depot; (35) $122.43 for flooring and paneling for hunting camp, purchased from Home Depot; $48.63 for sanding supplies for camp,  purchased at Home Depot; (36) $318.12 to Dottie Lou for multiple deer processings; ($37) $151.89 for various hunting supplies, purchased from Dick's Sporting Goods; (38) $89.57 for hemlock lumber and screws for hunting trailer, purchased from Robert Griffis and Sons;  (39)

III.    DISCUSSION

Plaintiffs seek specific performance, seeking the Court to require Defendant, Thomas D. Ferris, to convey by special warranty deed the subject 104.4 acre tracts of land to Plaintiffs within thirty (30) days of this opinion.  ·

Granting the equitable remedy of specific performance is discretionary with the Court.  In so granting the Court should act to compel the performance of a contract in the precise terms agreed upon or substantially.

In the matter at hand there exists no written contract between the Plaintiffs and the Defendant.  However, there is an abundant amount of evidence in written form such as copies of checks, copies of inter account transfers, receipts for purchases as well as email communications between Defendant and Plaintiffs which prove the existence of an agreement between the Plaintiffs in connection with the purchase and upkeep of the real properties.  Noteworthy is the fact that Defendant in written communications refers to the Plaintiffs as "investors".  These are the same members of the hunting club who have paid their accounts in full according to the accounting by Robert Ferris who by agreement of all other Plaintiffs and Defendant himself

27

handled the monies paid in by members, monies received through a timber contract and monies realized for work performed.

Noteworthy is the fact that we find Thomas Ferris as well as Plaintiffs attended meetings of the hunting club and held discussions concerning the purchase and upkeep of the subject real properties.

Obviously because Defendant, Thomas Ferris never paid any amount to Robert Ferrris to anywhere near enough to pay the first mortgage obligations, this further shows the Plaintiffs had an agreement with Defendant, Thomas Ferris, and Plaintiff, Robert Ferris, to have the real property deeded to them upon their full payment toward the purchase price.

We also note that as to the smaller four acre parcel, Robert Ferris credited Thomas Ferris for his purchase price of the same. This is evidence by the accounting and meeting minutes.

Also of importance is the fact that Thomas Ferris caused the four acre parcel to be deeded over to him and Robert Ferris, even though he had originally titled it in his name only.

Despite his "share" diminishing by joining the Plaintiffs, Robert Ferris along with other Plaintiffs freely admits and agrees to an oral agreement entered into by all Plaintiffs and Defendant concerning the ownership by all of the subject real properties.

In summary Plaintiffs have proven a valid oral agreement entered into by all Plaintiffs and Defendant, Thomas D. Ferris, for the purchase and conveyance of the subject collective 104.4 acres. They have further proven that Defendant, Thomas D. Ferris, has violated the agreement by not conveying the subject real property to the member Plaintiffs in their respective shares. Lastly, there is no adequate remedy at law as to his nonperformance relating to the non-conveyance of the 104.4 acres.

28

## IV DECISION

In regard to the counterclaim of Thomas D. Ferris, in that the record grantees/owners of the subject real property is Ordered changed by execution and delivery of a special warranty deed, and as such the recorded interests shall be changed, any partition now sought would be premature and not representative of the parties and their respective interests. The counterclaim of Thomas D. Ferris seeking partition must be dismissed.

29